1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10

OPENWAVE SYSTEMS INC.,                                No. C 10-02805 WHA

11
                    Plaintiff,

12
        v.                                            **ORDER DENYING**
                                                      **SUMMARY JUDGMENT**
13
MYRIAD FRANCE S.A.S.,

14
                    Defendant.

15
———————————————————/

16
AND RELATED COUNTERCLAIMS

17
———————————————————/

18
                            **INTRODUCTION**

19
        In this dispute regarding the ownership of 36 patents and one patent application, plaintiff

20
and counterdefendant Openwave Systems Inc. moves for partial summary judgment on its claim

21
for declaratory relief. Defendant and counterclaimant Myriad France S.A.S. opposes. For the

22
reasons stated below, Openwave's motion is **DENIED**.

23
                            **STATEMENT**

24
        Openwave is a California company that develops software for use in networked

25
computing. Many computer networks utilize a client-server architecture. This architecture

26
enables multiple "client" devices — such as mobile phones and personal computers — to request

27
data and services from one central "server" machine. Before 2008, Openwave developed

28
software products for use on both the client side and on the server side of such networked

computing. In March 2008, however, Openwave announced plans to discontinue its client-side

business and focus exclusively on its server-side business (Schuman Exhs. 2, 3 at 29–30).

In June 2008, Openwave sold the client-side business to Purple Labs S.A., a French

company. The transaction documentation included an Asset Purchase Agreement and an

Intellectual Property License Agreement, both dated June 27, 2008 (Rushforth Exh. A; Schuman

Exh. 1). As part of the transaction, Openwave assigned twenty United States patents, two United

States patent applications, and four foreign patents to Purple Labs (Rushforth Exh. A at

Agreement 1, Schedule 3–4). Openwave also licensed two other United States patents to Purple

Labs (Schuman Exh. 1 at § 1.7, Exh. A).

The IPLA included the following provision to address the subsequent assignment of later-

identified patents that should have been, but were not, assigned as part of the June 2008 deal:

> **2.4    Missing Assigned Patents.** From time to time,
> Purple Labs may become aware of the existence of a Missing
> Assigned Patent. For those Missing Assigned Patents that Purple
> Labs identifies to Openwave and are confirmed by Openwave to
> comply fully with the definition of an [*sic*] Missing Assigned
> Patent, Openwave shall assign all of its right, title and interest in
> such Missing Assigned Patents to Purple Labs and shall execute a
> patent assignment substantially in the form of Exhibit B for such
> Missing Assigned Patents.

(Schuman Exh. 1 at § 2.4). The IPLA defined "Missing Assigned Patents" as follows:

> **1.3    "Missing Assigned Patents"** means patents owned
> by Openwave immediately prior to the execution of the APA (or
> patents issuing on patent applications owned by Openwave
> immediately prior to the execution of the APA) that contain
> claims that, immediately prior to the execution of the APA, cover
> products or services in the "Business" (as defined in the APA) but
> do not cover products or services in the Openwave Field of Use;
> and (b) were not assigned to Purple Labs as "Seller IP" pursuant to
> the APA.

(*id.* at  § 1.3). The "Business" was the "mobile client software business" Openwave sold to

Purple Labs (Rushforth Exh. A at A-1), and the Openwave Field of Use referred to the "server

software" business Openwave retained (Schuman Exh. 1 at § 1.9). Specifically, "Business" was

defined to mean "the mobile client software business of the Seller, and its direct and indirect

subsidiaries, that develops, distributes, markets, sells, licenses, and supports various handset

software clients such as browsers, SMS, EMS and MMS and email messaging clients, java

2

clients, UI, widgets, graphics engines and other software designed for mobile handsets"

(Rushforth Exh. A at A-1).

The IPLA separately addressed the subsequent *licensing* of "omitted necessary IP" — any

intellectual property that was retained or received in the deal by one party, but which turned out

to be "reasonably necessary" to the business retained or received by the other party.  Upon

receiving notice of omitted necessary IP, a party was required to "automatically grant" a license.

Regarding such demands by Purple Labs, the IPLA stated:

> **3.2     For Purple Labs.**  If Purple Labs reasonably
> determines that Openwave, as of the Effective Date, owned any
> intellectual property or Intellectual Property Right that (a) was not
> included within the Seller IP or the Licensed Patents and (b) is
> reasonably necessary for Purple Labs' use, development,
> modification, manufacture, marketing, distribution, sale, or support
> of products and services in the PL Field of Use (the **"Omitted PL
> Necessary IP"**), then Purple Labs may give written notice to
> Openwave identifying such Omitted PL Necessary IP, whereupon
> Openwave will automatically grant to Purple Labs the following
> licenses, as appropriate:

(Schuman Exh. 1 at § 3.2).  The PL Field of Use referred to the client-side business involving

"software designed for mobile handsets" that was sold to Purple Labs (*id.* at § 1.10).  Two

automatic licenses were set forth, one tailored to patent rights, and the other encompassing all

other types of intellectual property (*id.* at § 3.2(a)–(b)).

In July 2008 — about a week after the deal closed — Purple Labs requested "a cross

licensing agreement" on one of the patents Openwave had retained (Schuman Exh. 20 at 3).

Purple Labs, however, did not pursue that request, and no additional license was granted.  No

other licensing or assignment requests were made for the next two years.

                    *                    *                    *

In February 2009, Purple Labs and Esmertec AG executed a business-combination

agreement under which Purple Labs became a wholly-owned subsidiary of Esmertec (Schuman

Exh. 22 at § 2.1).  The rest of the history connecting Purple Labs with Myriad is less clear.

Myriad explains that after the February 2009 business-combination deal, Esmertec AG changed

its name to Myriad Group AG, and "Purple Labs SA changed its name to Myriad France and its

corporate form to an SAS."  Myriad, however, identifies no evidence documenting these name

changes (Opp. 23).  Openwave recounts that Purple Labs "was acquired by" Myriad Group AG, "a publicly traded Swiss conglomerate" on or about March 2009.  Openwave identifies no evidence of this supposed transaction, but Openwave adopts the allegation from Myriad's pleadings that "on or about July 2009 the shareholders of Purple Labs changed Purple Labs' company name into Myriad France S.A.S." (Br. 9–10; Dkt. No. 52 ¶10).  An August 2009 French public record refers to "the company Purple Labs SA, currently named MYRIAD FRANCE, SAS" (Hellfeld Exh. 30 at MYR009502).  Thus, it appears that sometime between February 2009 and August 2009 Purple Labs became Myriad, the defendant and counterplaintiff in this action.

In July 2010, Myriad sold all of the United States patents and patent applications from the July 2008 Openwave deal to Google Inc. (Schuman Exh. 26 at MYR053082–84).  During Myriad's negotiations with Google, Myriad's counsel offered, "if you have identified specific patents owned by OPWV that you would be happy to purchase through us, pls let me know as we may have a way to get them (if they are somehow browser related)" (Schuman Exh. 23 at MYR052861).  Two weeks later, on July 27, 2010, Myriad sent Openwave a letter demanding assignment of ten patents pursuant to the missing-assigned-patents provision of the June 2008 agreement (Schuman Exh. 24).  Five months later, on December 28, 2010, Myriad sent Openwave a second letter demanding assignment of an additional twenty-five patents and one patent application (Schuman Exh. 25).  Myriad's demand for these patent assets is the subject of the present dispute.

*          *          *

Openwave filed this action in June 2010, alleging that Myriad had failed to comply with certain aspects of the June 2008 deal relating to escrow funds and indemnity (Compl.).  The operative complaint, however, no longer raises these issues.  Openwave now seeks a declaratory judgment that Myriad is not entitled to assignment of the disputed patent assets.  Openwave also seeks injunctive relief and damages on the theory that Myriad's demands amount to unfair competition and intentional interference with prospective economic advantage (Sec. Amd. Compl. 4–6).  Myriad's operative counterclaims seek a declaratory judgment that Myriad *is* entitled to assignment of the 35 patents and one patent application it has identified, as well as

4

**United States District Court**
For the Northern District of California

1   specific performance of the missing-assigned-patents provision and attorney's fees and costs (Sec.

2   Amd. Countercl. 11–12).

3        In November 2010, this action was divided into phases, and the parties were instructed

4   that the following threshold issues would be resolved first:  (1) the meaning of the word "cover"

5   in the definition of Missing Assigned Patents; (2) the standing of Myriad France SAS to assert

6   rights under the June 2008 agreement; and (3) the validity of the contract clause providing for

7   assignment of "Missing Assigned Patents."  Fact discovery regarding these threshold issues has

8   closed.  Openwave now moves for partial summary judgment on its claim for declaratory relief.

9   Most of Openwave's arguments target the first two threshold issues, but Openwave also advances

10  broader summary judgment arguments.  Myriad opposes.  This order follows full briefing and a

11  hearing on the motion.

12                                          **ANALYSIS**

13       Summary judgment is proper when "there is no genuine dispute as to any material fact and

14  the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this analysis, all

15  reasonable inferences must be drawn in the light most favorable to the non-moving party.

16  *Johnson v. Racnho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1018 (9th Cir. 2010).  Unsupported

17  conjecture or conclusory statements, however, cannot defeat summary judgment.  *Surrell v. Cal.*

18  *Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008).

19       Where the party moving for summary judgment would bear the burden of proof at trial,

20  that party bears the initial burden of producing evidence that would entitle it to a directed verdict

21  if uncontroverted at trial.  *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*,

22  213 F.3d 474, 480 (9th Cir. 2000).  Where the party moving for summary judgment would not

23  bear the burden of proof at trial, that party bears the initial burden of either producing evidence

24  that negates an essential element of the non-moving party's claims, or showing that the non-

25  moving party does not have enough evidence of an essential element to carry its ultimate burden

26  of persuasion at trial.  *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102

27  (9th Cir. 2000).  If the moving party does not satisfy its initial burden, then the non-moving party

28  has no obligation to produce anything and summary judgment must be denied.  If, however, the

1    moving party satisfies its initial burden of production, then the non-moving party must produce

2    admissible evidence to show there exists a genuine issue of material fact. *Id.* at 1102–03.

3         **1.    JUDICIAL NOTICE.**

4         Openwave requests that the Court take judicial notice of the patents and patent application

5    whose ownership are disputed in this action (Dkt. No. 140).  "A Court shall take judicial notice if

6    requested by a party and supplied with the necessary information."  FRE 201(d).  Judicial notice

7    is appropriate for facts not subject to reasonable dispute in that they are "capable of accurate and

8    ready determination by resort to sources whose accuracy cannot reasonably be questioned."

9    FRE 201(b).  In particular, a court may take judicial notice of matters of public record.  *Lee v.*

10   *City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).  Openwave provided copies of all the

11   patent and application documents, supported by a sworn declaration (Dkt. No. 140).  These items

12   are matters of public record.  Accordingly, the request for judicial notice is **GRANTED**.

13        **2.    STANDING.**

14        One of the threshold issues designated for determination during this phase of the action is

15   "the standing of Myriad France SAS to assert rights under the contract" (Dkt. No. 26 at 1).

16   Openwave now requests a summary judgment ruling that Myriad lacks standing to invoke the

17   missing-assigned-patents provision of the IPLA.  Openwave, however, has not earned such

18   a ruling.

19        Openwave relies on the following provision from the IPLA:  "Any purported transfer,

20   assignment, or delegation without the appropriate prior written consent will be null and void

21   when attempted and of no force or effect."  This provision follows a sentence explaining that

22   neither party may assign the agreement or any rights under it to any third party without the other

23   party's prior written consent, except in four types of circumstances (Schuman Exh. 1 at § 7.3).

24   Openwave argues that "Myriad's acquisition of Purple Labs is an attempted transfer of rights by

25   Purple Labs" under California law (Br. 18).  To support this conclusion, however, Openwave

26   cites only one district court decision.  Closer scrutiny of California law, which Myriad does not

27   dispute governs the question whether an attempted transfer of rights took place, reveals that the

28   answer is not so simple.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    Under California law, the meaning of bilateral contract terms forbidding assignment is a

2    matter of interpretation.  When interpreting such language, the validity of an assignment that

3    results merely from a change in the legal form of ownership of a business depends upon whether

4    the assignment affects the interests protected by the nonassignability provision.  *Trubowitch v.*

5    *Riverbank Canning Co.*, 182 P.2d 182, 30 Cal. 2d 335, 344–45 (1947).  Contrary to what

6    Openwave suggests, the law does not presume that a forbidden (and therefore void) transfer of

7    rights occurred when Purple Labs became a subsidiary of Esmertec.

8    Openwave does not provide any analysis of facts or law regarding whether the

9    "acquisition" (a term that Openwave uses and Myriad disputes) of Purple Labs affected the

10   interests protected by the nonassignability provision, or even what those interests might be.  Nor

11   does Openwave address any of the four exceptions enumerated in the agreement that would allow

12   assignment without prior consent.  As such, Openwave has not established that the "acquisition"

13   of Purple Labs involved a void transfer of rights.  Openwave failed to carry its initial burden of

14   showing that Myriad lacks standing, so no burden is shifted to Myriad on the standing issue.

15   Openwave's request for a summary judgment ruling that Myriad lacks standing to invoke the

16   missing-assigned-patents provision of the IPLA is **DENIED**.

17        **3.    TIMELINESS AND LACHES**.

18   Related to the question whether Myriad may assert rights under an agreement made by

19   Purple Labs is the question whether Myriad may now assert rights under an agreement made in

20   July 2008.  Openwave argues that Myriad's demand for assignment of the disputed patents is

21   untimely pursuant to the agreement itself, and also is barred by laches.  Both arguments fail.

22        **A.    Timeliness.**

23   Section 2.4 of the IPLA provides for the assignment of Missing Assigned Patents whose

24   existence Purple Labs may become aware of "[f]rom time to time."  This language does not

25   suggest that the right to assignment of Missing Assigned Patents came with an expiration date.

26   Openwave nonetheless argues that it did.

27   Specifically, Openwave argues that the parties intended the phrase "from time to time" to

28   give Purple Labs "no longer than eighteen months from the June 2008 closing date to identify

7

United States District Court

For the Northern District of California

allegedly missing patents" (Br. 16) (emphasis omitted).  Openwave points to drafts of the IPLA

that did not include any provision addressing "Missing Assigned Patents" or their assignment, but

that did include an eighteen-month limitation in the provision for licensing of "Omitted Necessary

IP" (Schuman Exhs. 15, 16, 34).  Openwave presents deposition testimony explaining that

Openwave preferred a shorter limitation, and that the language "from time to time" was

introduced because the parties could not agree to a compromised time limit:

> From time to time was added because Purple Labs wanted the
> 18-month outset, and Openwave wanted something less than
> 18 months, and the parties could not agree on a time less than
> 18 months and more than 90 days or six months from Openwave,
> so from time to time was added with the intent that it would not
> be forever.

(Schuman Exh. 9 at 212:21–213:2).  Thus, Openwave argues that the phrase "from time to time"

in the missing-assigned-patents provision embodies the parties' intent that the rights conferred by

that provision would expire after some period of time between ninety days and eighteen months.

Openwave also asserts that California courts have construed similar language to mean "within a

reasonable time" (Br. 16).

This argument does not hold water.  Nowhere in Openwave's evidence regarding

negotiation of the eighteen-month limitation is there a clear indication that it was intended to

apply to the missing-assigned-patents provision of Section 2.4 as well as to the omitted-

necessary-IP provision of Section 3.2.[1]  Moreover, the fact that the parties failed to agree to a

specific number does not imply that they agreed to a range.  Even if the parties agreed "that it

would not be forever," their selection of the phrase "from time to time" indicates their preference

to roll the dice on possible future disputes.  Openwave's evidence shows that this language was

adopted *because* it did not convey a specific time limit.  Reading one into it would frustrate the

parties' intent.

As to the interpretation of similar language by California courts, Openwave cites only one

decision.  In 1934, the California Court of Appeal found that "the words 'at any time' in the letter

---

[1] It is, however, worth noting that Myriad submitted a redline draft of the IPLA that includes a crossed-out eighteen-month limitation in the missing-assigned-patents provision of Section 2.4 (Hellfeld Exh. 24 at MYR040936).

8

above quoted do not mean to the end of time, but only that acceptance of the proposal could be made on payment of $2,500 by appellant *within a reasonable time*; and under section 1587 of the Civil Code it was revoked by a failure to accept long before the time tender was made." *Throop v. McGregor*, 34 P.2d 187, 139 Cal. App. 451, 454 (1934) (emphasis added). This single example from a contract *formation* context does not compel the interpretation urged by Openwave in this contract *performance* dispute. Openwave has not carried its burden of showing that Myriad's patent-assignment demands are unreasonably untimely per the terms of the June 2008 agreement. No burden is shifted to Myriad on this issue. Openwave's request for a summary judgment determination of untimeliness is **DENIED.** A trial will decide whether the request was unreasonably late.

### B.     Laches.

Openwave also argues that Myriad's demand for assignment of the patent assets is barred by the equitable doctrine of laches (Br. 17). "To demonstrate laches, [Openwave] must prove both an unreasonable delay by [Myriad] and prejudice to itself." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001). Openwave has not carried this burden.

The question of unreasonable delay is determined in two steps. First, the length of the delay is assessed, and then its reasonableness is considered. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002). The length of the delay is measured from the time the party knew or should have known about its potential claim until the time when the claim was filed. *Danjaq*, 236 F.3d at 952. Myriad's patent-assignment counterclaims initially were filed in December 2010, two and a half years after the deal was closed (Dkt. No. 31 at 10). Openwave refers to "Myriad's twenty-five month delay," suggesting that the clock began to run immediately in June 2008, before the ink on the contract was dry (Br. 17). The missing-assigned-patents provision, however, presupposes that Myriad did not and could not have know about the patents at the time the agreement was executed. The question of when Myriad discovered or should have discovered its patent-assignment claims must be answered by looking beyond the time of execution.

United States District Court
For the Northern District of California

1    Myriad sent Openwave a letter demanding assignment of some of the disputed patent

2    assets in July 2010 and a second letter demanding assignment of the rest of them in

3    December 2010.  Thus, Myriad was aware of its potential claims by those dates.  Openwave does

4    not present any evidence that Myriad knew or should have know of its claims earlier.  Openwave

5    cites Myriad's July 2008 licensing request as "evidence that Purple Labs appreciated that it

6    needed to act promptly to identify any IP that it should have but didn't get as part of the 2008

7    transaction with Openwave," but this inference is a stretch (Br. 16).  As Myriad notes, the passive

8    language of the IPLA does not impose any affirmative duty to look for Missing Assigned Patents

9    but rather allows Myriad to demand assignment whenever Myriad "may become aware of the

10   existence of a Missing Assigned Patent" (Opp. 16; Schuman Exh. 1 at § 2.4).  In light of this

11   contract language, a trier of fact need not agree with Openwave that Myriad was obligated to

12   identify Missing Assigned Patents promptly.

13   On the present record, it cannot be said that Myriad knew or should have known of its

14   assignment claim before July 2010 for ten of the patents and December 2010 for the rest.  Thus,

15   the delay period for purposes of this laches analysis was only five months for the first group of

16   patents and no time at all for the second group.  These periods of time are so short that they are

17   presumptively reasonable.  The reasonableness of a claimant's delay typically is considered in

18   light of the time allotted by the limitations period from an analogous statue.  *Jarrow*, 304 F.3d at

19   838.  Here, the parties dispute what limitations period might be used as a measuring stick, but a

20   delay of five or zero months would be reasonable by comparison to any statute.  Openwave has

21   not established that Myriad's delay was unreasonable.  Accordingly, Openwave's request for a

22   summary judgment ruling that Myriad's patent-assignment demand is barred by laches is

23   **DENIED**.  This order need not reach the question whether Openwave was prejudiced by

24   Myriad's delay.

25   **4.      CONFIRMATION BY OPENWAVE.**

26   Openwave seeks summary judgment regarding Myriad's assignment demand for the

27   additional reason that Openwave has not confirmed that the disputed patents qualify as Missing

28   Assigned Patents.  Specifically, Openwave argues that the phrase "and are confirmed by

10

United States District Court
For the Northern District of California

1   Openwave to comply fully with the definition of an [*sic*] Missing Assigned Patent" in Section 2.4

2   of the IPLA is a condition precedent to assignment, and that this condition has not been fulfilled.

3   Accordingly, Openwave argues, Myriad is not entitled to assignment (Br. 10–11).

4           Even if Openwave's interpretation of the confirmation clause were adopted, Openwave

5   would not have *carte blanche* to block assignment by arbitrarily and capriciously withholding

6   confirmation that a particular patent qualified as a Missing Assigned Patent.  On the contrary, the

7   implied covenant of good faith and fair dealing would require Openwave to exercise its

8   discretionary power in good faith.  *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,

9   826 P.2d 710, 726 (1992).  Openwave makes the conclusory statement that "there is abundant

10  record evidence demonstrating that Openwave's interpretation of the Missing Assigned Patents

11  Clause is not arbitrary or objectively unreasonable" (Reply Br. 7).  Openwave, however, does not

12  cite any evidence that would support a summary judgment determination as a matter of law that it

13  acted in good faith in refusing to confirm that any of the disputed patent assets qualify as Missing

14  Assigned Patents.

15          Indeed, Myriad has identified *thirty-six* issued or pending patents as meeting the

16  definition, and Openwave has not confirmed even a single one of them.  Prior to the July 2008

17  negotiations, Openwave advertised 42 United States patent assets, including 31 issued patents, as

18  "covering" its client products (Hellfeld Exh. 3 at OPWV00044840).  When finalizing the deal,

19  Openwave identified and assigned only twenty United States patents and two pending

20  applications (Rushforth Exh. A at Agreement 1, Schedule 3–4).  In light of this reduction, the

21  procedure in question was written into the contract for resolving how many of the remainder, if

22  any, covered the client-side business.  Openwave has not carried its burden of proving that every

23  single one of its thirty-six denials was not assignable, much less denied in good faith.

24  Accordingly, Openwave's motion for a summary judgment determination that the confirmation

25  clause defeats Myriad's patent-assignment demands is **DENIED**.

26          **5.      INTERPRETATION OF "COVER."**

27          Openwave also seeks a summary judgment ruling on the meaning of the word "cover" in

28  the definition of Missing Assigned Patents.  Specifically, Openwave would limit the definition to

patents whose inventions (1) relate *only* to the client-side business (as opposed to the server-side business or some combination of the two), and (2) were actually used in an Openwave client product when the June 2008 deal was closed (Br. 11–15). This order declines to do so.

On the first question — whether qualifying patents must cover *only* the client-side business — there is credible evidence on both sides of the scale. Myriad's strictly grammatical reading of the definition of Missing Assigned Patents reveals that the clause "but do not cover products or services in the Openwave Field of Use" modifies the word "claims," not the word "patents." "Claims," of course, is plural. This reading suggests that any patent with at least two claims that cover the client-side business but do not cover the server-side business is a Missing Assigned Patent. The result would be assignment of any such patent, even if the patent had 100 other claims that covered only the server-side business retained by Openwave. On the other hand, Openwave points to other passages in the IPLA and to credible parol evidence suggesting that the parties did not intend this result. The "Omitted Necessary IP" licensing provisions of the IPLA, the emails exchanged by the companies' CEOs immediately before the deal was closed, and the patents the agreement specifically identified for assignment or licensing suggest that patents covering only the client-side business were to be assigned, but patents covering both sides of the business were to be retained by Openwave and *licensed* to Myriad. On the summary judgment record, this dispute is sufficiently balanced to deny summary judgment.

On the second question — whether qualifying patents must correspond to actual Openwave products that existed in June 2008 — Openwave also is not entitled to summary judgment. The definition of Missing Assigned Patents requires claims that "cover products or services in the 'Business,'" and the Business includes "develop[ment]" (Schuman Exh. 1 at § 1.3; Rushforth Exh. A at A-1). That language alone is enough to enable a reasonable trier of fact to conclude that Missing Assigned Patents could cover *potential* client-side products as well as existing ones. Openwave's motion for a summary judgment ruling on the meaning of the word "cover" is **DENIED**.

Although not raised in Openwave's summary judgment motion, a lurking issue regarding interpretation of the word "cover" is whether the coverage question must be answered by a

**United States District Court**
For the Northern District of California

1  rigorous infringement analysis. In the Court's tentative view, the word "cover" was not used in

2  that technical sense. A requirement that claims must "read on" a client-side product but not "read

3  on" a server-side product would entail bone-crushing infringement trials for each of the 36

4  disputed patent assets, involving both client products *and* server products. This enormous burden

5  cannot possibly be what the parties intended. Not one shred of proof has yet been offered that the

6  parties contemplated such a demanding standard. There will be no need for *Markman* hearings.

7  The jury or judge will sort out which patents are Missing Assigned Patents based on how a

8  reasonable business person would have assessed coverage.

9  **CONCLUSION**

10        For the foregoing reasons, plaintiff's motion for summary judgment is **DENIED**. No

11  motion for summary judgment having been made by Myriad, it is not possible to enter a partial

12  summary judgment in its favor on any contract-interpretation issues. The June 2 deadline for

13  filing such a motion has not yet passed, but Myriad is reminded that it must obtain prior

14  permission before filing a motion for summary judgment. The foregoing issues have been

15  massively litigated. If Myriad desires to file a motion for summary judgment, it first must seek

16  permission by way of a précis explaining what benefit could be accomplished by another round of

17  summary judgment litigation. The précis may not exceed five pages of double spaced, twelve-

18  point Times New Roman font, with no footnotes and no attachments.

19        With the benefit of the foregoing, counsel shall meet and confer in person and devise a

20  trial plan and a plan leading up to it, paying particular mind to what issues are jury versus judge

21  issues. Please file a description of the trial and pre-trial plan by **JUNE 2, 2011**.

22

23        **IT IS SO ORDERED.**

24

25  Dated: May 13, 2011.

26  WILLIAM ALSUP
                                UNITED STATES DISTRICT JUDGE

27

28